[No. F009061. Fifth Dist. Dec. 7, 1988.]

In re CHRISTIE D., a Person Coming Under the Juvenile Court Law.
MERCED COUNTY HUMAN SERVICES AGENCY, Plaintiff and Respondent, v.
SHARON D. et al., Defendants and Appellants.

470

COUNSEL

Robert Ishikawa for Defendants and Appellants.

Dennis L. Myers, County Counsel, and Allen R. Berrey, Deputy County Counsel, for Plaintiff and Respondent.

Betty L. Dawson, under appointment by the Court of Appeal, for Minor.

OPINION

BEST, J.—

## STATEMENT OF THE CASE

On March 30, 1987, a petition was filed alleging that Christie D. was a dependent child under the provisions of Welfare and Institutions Code[1] section 300, subdivisions (a) and (d), specifically alleging: "Said minor is in need of proper and effective parental care or control and has no parent or guardian willing to exercise or capable of exercising such care or control and further, whose home is unfit for her by reason of cruelty, depravity, and physical abuse. On March 27, 1987, the minor stated and demonstrated that she orally copulated her father's penis, calling it a 'weiner.' She also stated her mother knows about this and tells her father 'no.' The minor also demonstrated how she kisses her mother's 'titties' and kisses her mother's vagina.

". . . . . . . . . . . . . . . . . . .

"There is a substantial danger to the physical health of said minor and there is no reasonable means by which said minor's physical health can be protected without removing the minor from her parents' physical custody."

On March 31, 1987, a detention hearing was held and the parents stipulated to detention with visitation rights until the jurisdictional hearing date.

On April 2, 1987, an attorney was appointed to represent the minor. An initial jurisdictional hearing was held on April 21, 1987, at which time leave was granted to Merced County Human Services Agency (hereinafter HSA)

[1] All statutory references are to the Welfare and Institutions Code unless otherwise indicated.

to file an amended petition to allege harmful withholding of the minor's medication by her parents, and the jurisdictional hearing was continued to May 5, 1987. Before the May 5, 1987, jurisdictional hearing was held, HSA petitioned the court to rescind its previous order allowing unsupervised visits between the minor and her parents and requesting that the court order any contact between the minor and the parents be supervised. This request was granted by the court on April 27, 1987.

The jurisdictional hearing was held on May 5 and 6, 1987, at the conclusion of which the lower court found the allegations of the petition, except for the withholding of medication allegation, to be true.

The parents' motion to reconsider the jurisdictional finding, based on the then recently announced decisions of *In re Amber B.* (1987) 191 Cal.App.3d 682 [236 Cal.Rptr. 623] and *In re Christine C.* (1987) 191 Cal.App.3d 676 [236 Cal.Rptr. 630], was heard and denied on July 16, 1987. After denying the motion, the court requested the parties to set up what they considered reasonable counseling "and also talk about getting Christie back into unsupervised visits, and if you can't resolve it, then I'll take care of it." After a recess was taken, the parents stipulated to "the standard dispositional finding under Section 361(b)(1) . . . of the Welfare and Institutions Code" and various dispositional-visitation orders were made by the court.

Parents filed a timely notice of appeal on July 31, 1987. We reverse.

### STATEMENT OF FACTS

Christie D., born September 15, 1981, was approximately five and one-half years old at the time of the jurisdictional hearing held May 5 and 6, 1987. Christie has had problems all her life, beginning with serious ear and respiratory infections as an infant. She was also allergic to milk formula and had medical difficulties as a result. Before reaching her third birthday, Christie had tubes surgically inserted in her ears three times and had her tonsils and adenoids surgically removed. She was constantly ill.

Christie's mother has sought both medical and psychological help for Christie. The specialists who have worked with Christie agree that her mother has been active in seeking help, in cooperating and in following through on professional advice.

In March 1986, when Christie was approximately four and one-half years old, Wendy Vincent, a school psychologist for the Merced City School District, evaluated Christie in order to determine the most appropriate school placement for her. Ms. Vincent found Christie "significantly delayed

in all areas." These included her development in areas such as communication abilities, vocabulary, daily living skills and motor skills. In most areas, Christie tested at the approximate level of a two-year-old child. Ms. Vincent diagnosed the problem as "attention deficit disorder with hyperactivity as well as some other issues," and recommended that Christie be placed in one of two schools equipped to handle the needs of special children. Sierra School was selected because it addresses itself primarily to the needs of children with emotional and behavioral handicaps. Christie began attending Sierra in May or June of 1986 and continued there through the jurisdictional hearing below.

In the fall of 1986, Christie's teacher at Sierra School was Kathy Mays. The class size ranged from four to eight students at different times. At times, Christie was the only girl in the class. In the fall of 1986, some rather general problems developed in Christie's class involving inappropriate touching by the students of one another. In October 1986, Charlene Birks, an instructional aide in Christie's class, observed Christie kissing another little girl in the classroom. Ms. Birks also saw Christie "fingering" another little girl through her clothing in the vaginal area while they were standing in a lunch line at school. Ms. Birks informed Kathy Mays of what she had seen. Ms. Mays also had witnessed what she considered to be sexually inappropriate behavior by Christie. Such behavior included "open-mouth" kissing and "grabbing" the behinds of other children. Ms. Mays wrote a report after hearing from Ms. Birks of the kissing and the lunch line incident involving Christie. No further action was taken.

In mid-March 1987, Ms. Mays began noticing that Christie was touching herself "a little bit more." She spoke about this to Pat Ladousier, program coordinator and clinical therapist with the INSITE Program for emotionally disturbed children in which Christie was enrolled. At about the same time, Christie's mother noticed that Christie was "using bad words" and was "talking a lot about kissing and humping." Christie's mother talked to her about this and was concerned about what was happening in Christie's classroom where she was the only little girl. Mrs. D. also noticed that the boys on Christie's school bus always wanted her to sit by them and fought for that privilege.

Pat Ladousier met with Christie six times over a two-week period in March 1987. Ms. Ladousier and other INSITE personnel noticed a "variety of behaviors [by Christie] which are indicative of children who have been sexually abused." Although Ms. Ladousier did not consider investigation to be a part of her job, she was trained to recognize behaviors which are indicative of sexual abuse. Although denying doing so for any investigative purpose, Ms. Ladousier engaged Christie in a session of play with anatomi-

cally correct dolls in March 1987. She did so after noticing behavior she considered suspect and after speaking with someone at child protective services in regard to whether the behaviors constituted grounds to require a sexual abuse report from her. Over strenuous objection of counsel for Christie's parents, Ms. Ladousier testified concerning her observations of Christie's play with the dolls. When the session with the dolls commenced, there were a variety of toys for Christie to play with. She chose the dolls. Her play with the dolls eventually became quite "graphic." Christie called the penis of a male child doll a "weiner" and tickled it. She sucked on the breast of a female adult doll, and put her finger in the vagina, saying that her finger was a weiner. With the girl child doll, Christie "fingered" the vagina, called the breasts "titties" and said the vagina was "a pottie like mine." She orally copulated the male child doll. She wanted to show the male adult doll to the other children. In response to an objection to this testimony by counsel for the parents, the trial court excluded evidence of statements made by Christie in response to questions during the doll play session. Given the state of the record, however, it is impossible to determine precisely what was and was not excluded.

After the session with the dolls, Ms. Ladousier made a sexual abuse report regarding Christie. She did so not only because of Christie's quite graphic sexual play with the dolls, but also because of the other behaviors by Christie which Ms. Ladousier considered indicative of sexual abuse. These behaviors included sexually inappropriate behavior with peers, seductive behavior with male therapists and "extremely belligerent [conduct by Christie] with her mother." Ms. Ladousier considered all of these factors indicative of sexual abuse. What Ms. Ladousier considered inappropriate about Christie's play with the dolls was, "The oral copulation, the continuing admonition for me not to tell, the placing of the finger inside the vagina of the adult female doll."

When asked to assign a number to Christie's behavior with the dolls on a scale of 1 to 12 from least graphic to most graphic, Ms. Ladousier assigned Christie's behavior the number 11. She acknowledged, however, that sexual abuse was not the only possible explanation of Christie's behavior and stated that she was unable to make any definitive conclusions regarding the question of sexual abuse.

After Ms. Ladousier's report, Sheriff's Detective Jill Mayer and Child Protective Services Worker Shirley Corbin went to Christie's school and engaged her in a second session of play with the anatomically correct dolls. Again over objection by counsel for Christie's parents, Ms. Mayer testified to very graphic play by Christie with the dolls. According to Detective Mayer, who had used anatomically correct dolls in numerous investigations

over the course of her six to seven years as a detective, "Christie demonstrated the most graphic actions I've ever seen."

After the session with the dolls, Detective Mayer and Ms. Corbin detained Christie and notified her parents of the detention. The date of the detention was March 27, 1987.

Christie was placed in out-of-home placement and remained out of the home through the dispositional proceeding which occurred on July 30, 1987. Commencing April 21, 1987, however, unsupervised visits between Christie and her parents were ordered. Shortly thereafter, HSA filed a request that the order for unsupervised visits be revoked. In support of the request, HSA submitted a declaration from Child Protective Services Worker Shirley Corbin which included certain double hearsay statements from Christie through her teacher, Kathy Mays. At the jurisdictional hearing, the juvenile court judge questioned Ms. Mays concerning what Christie had told her. Without objection, Ms. Mays testified that Christie told her, "he put the weiner in my mouth but not no more."

## DISCUSSION

## I

*Should the Appeal Be Dismissed Due to Parents' Stipulation to Factual Findings at the Dispositional Hearing?*

■ HSA contends that parents' appeal should be dismissed because parents stipulated to a dispositional order in this case. HSA acknowledges that such an argument has recently been squarely rejected in *In re Jennifer V.* (1988) 197 Cal.App.3d 1206 [243 Cal.Rptr. 441], where the court disposed of an identical contention as follows: "Counsel for the minor correctly points out that a party may not appeal from an order or judgment entered pursuant to stipulation. (*Lawler* v. *Bannerman* (1970) 8 Cal.App.3d 893, 894 . . . .) But she fails to establish that stipulation to a dispositional order necessarily implies consent to the antecedent *jurisdictional* order. Nor is that proposition self-evident. The dispositional phase of dependency proceedings is akin to the sentencing phase of criminal proceedings. (See *In re Kelvin M., supra,* 77 Cal.App.3d 396, 399.) By accepting a sentence of probation, a convicted defendant does not waive the right to appeal the conviction itself. Likewise, a parent should be able to accede to a dispositional order and so facilitate family reunification—a principal goal of the dependency case—without waiving the right to challenge the underlying order establishing court jurisdiction over the child in the first place. Only in

the event of an unambiguous stipulation to the jurisdictional findings would we find a waiver of that right. (See *In re Tahl* (1969) 1 Cal.3d 122 . . . .)

"At the dispositional hearing the parties filed a form stipulation, filling in the appropriate boxes and blank lines. The stipulation recited that Jennifer was a dependent child under section 300, subdivision (d), and, 'Pursuant to Sec. 361(b)(1)(4) of the W & I Code, to vest custody with parents would be detrimental to the minor . . . .' The remainder of the stipulation dealt with provisions for custody and placement.

"On its face the stipulation contains no parental admission of the truth of the jurisdictional allegations of child abuse and neglect. Troubling, of course, is the reference in the stipulation to section 361, subdivisions (b)(1) and (4)—provisions authorizing the out of home placement of minors in danger of physical and sexual abuse by their parents. But, again, there is no explicit admission that Jennifer was so abused. Absent such an admission, we cannot find Dale V. waived his right to challenge the jurisdictional findings. Thus we deny the motion to dismiss the appeal." (197 Cal.App.3d at pp. 1209-1210, fn. omitted.)

The factual circumstances in this case are almost identical to those of *In re Jennifer V.* The record reflects that parents and their counsel were anxious at the dispositional proceeding to insure that a rapid reunification plan be ordered. The trial court also was anxious to see Christie put "back into the home" as quickly as possible. HSA, on the other hand, was concerned about new allegations of abuse and was reluctant to proceed very rapidly with reunification. The trial court instructed the parties to meet and attempt to negotiate an agreement in reference to reunification. The parties did meet and did enter into an agreement regarding disposition and reunification. As part of the agreement, counsel for parents stated that he had no objection to findings pursuant to section 361, subdivision (b)(1), (3) and (4). However, counsel for parents made no "express factual stipulation" as HSA contends. Counsel merely stipulated to an arrangement which would facilitate reunification. HSA requests this court to disagree with the holding in *In re Jennifer V.* but offers no reasons why we should. We agree with the reasoning of the *Jennifer V.* court and reject HSA's request.

HSA alternatively requests "that this court at least refine the holding in *Jennifer V.* to require parents in future Section 300 cases to expressly preserve their objections to the jurisdictional findings if and when they stipulate to dispositional findings pursuant to Section 361. Such a rule would both insure fairness and certainty in dependency proceedings and would be in keeping with the general rule that an appellate court will not consider objections not properly made and preserved . . . ." A rule which would

both insure fairness and certainty in dependency proceedings is a desirable one. We believe the *Jennifer V.* rule does just that. HSA's suggestion would put the burden of making a record on the parents rather than on the county. This would not be in tune with existing law. (See, e.g., *In re Tahl* (1969) 1 Cal.3d 122, 124-134 [81 Cal.Rptr. 577, 460 P.2d 449]; Cal. Rules of Court, rule 1364.) California Rules of Court, rule 1364, provides that any admission of the truth of section 300 allegations must be accompanied by appropriate safeguards for the protection of parental rights and must be made personally by the parent or guardian. Similarly, in a situation such as this where the parents are naturally anxious to achieve reunification with their child, the burden should be on the county to establish not only that the parents are aware that by stipulating to a disposition they are also waiving their right to attack the original jurisdictional finding, but that they have personally and expressly made that waiver on the record. Such a rule eliminates any ambiguity as to what the stipulation was intended to cover and is the most effective way to insure fairness and certainty.

## II

*Should the Evidence Relating to the Minor's Behavior With the Anatomically Correct Dolls Have Been Excluded?*

■ Relying primarily on the recent case of *In re Amber B., supra,* 191 Cal.App.3d 682, parents contend that the testimony of Ms. Ladousier and Ms. Mayer about the minor's interaction with the anatomically correct dolls was inadmissible because no *Kelly-Frye* [2] foundation for such testimony was first established.

In *In re Amber B., supra,* a petition was filed alleging father had sexually molested his three-year-old daughter and that his one-year-old daughter was in risk of sexual abuse. At the hearing on the petition, the testimony of Dr. Raming, a psychologist who had examined Amber on three occasions, was admitted. His testimony included his opinion that Amber had been sexually molested and she believed she had been molested by her father. One of the factors upon which Dr. Raming's opinion was based was the nature of Amber's behavior with an anatomically correct female doll in Dr. Raming's office. The father objected to the evidence below and challenged the admission of Dr. Raming's opinion testimony on appeal, contending, "the opinion was based on a new scientific method of proof—the analysis of Amber's reports of abuse and behavior with anatomically correct dolls—

---

[2] *People* v. *Kelly* (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240]; *Frye* v. *United States* (D.C. Cir. 1923) 293 Fed. 1013 [54 App.D.C. 46, 34 A.L.R. 145].

that had not been shown to satisfy the *Kelly-Frye* test of admissibility." (*In re Amber B., supra,* 191 Cal.App.3d 682, 686.)

The Court of Appeal, after an extensive discussion and analysis of the *Kelly* and *Frye* cases, as well as more recent California Supreme Court cases (*People* v. *Shirley* (1982) 31 Cal.3d 18 [181 Cal.Rptr. 243, 641 P.2d 775]; *People* v. *McDonald* (1984) 37 Cal.3d 351 [208 Cal.Rptr. 236, 690 P.2d 709, 46 A.L.R.4th 1011]; *People* v. *Bledsoe* (1984) 36 Cal.3d 236 [203 Cal.Rptr. 450, 681 P.2d 291]), concluded as follows:

"We conclude that the practice of detecting child sexual abuse by (1) observing a child's behavior with anatomically correct dolls, and (2) analyzing the child's reports of abuse, is what *Shirley* characterizes as 'a new scientific process operating on purely psychological evidence' (31 Cal.3d at p. 53) and is subject to the *Kelly-Frye* test. The specific causes of age-inappropriate child sexual behavior, and indeed the entire field of child sexuality since the theories of Sigmund Freud, are beyond the scope of critical analysis by the average lay person. Thus a psychologist's examination and analysis employing the technique used by Dr. Raming may be surrounded by an 'aura of infallibility,' and a trier of fact would tend to ascribe 'an ordinately high degree of certainty' to the technique. (*People* v. *McDonald, supra,* 37 Cal.3d at p. 372.) Unlike with expert testimony where a witness gives a personal opinion, triers of fact are in no position to temper their acceptance of the psychological evidence 'with a healthy skepticism born of their knowledge that all human beings are fallible.' (*Ibid.*)

"The trial court therefore erred when it failed to require a showing of general acceptance in the relevant scientific community in accordance with *Kelly-Frye*." (*In re Amber B., supra,* 191 Cal.App.3d at p. 691.)

HSA contends that the facts in this case are easily distinguishable from the facts in *Amber B.,* and, therefore, the holding in that case is not controlling. Specifically, HSA points out that the testimony in *Amber B.* came from an expert who offered an opinion that, based upon his observations of the child, the minor, in fact, had been sexually molested. On the other hand, HSA points out the three factors it contends distinguishes this case: (1) neither the clinician nor the sheriff's deputy who testified about the doll play of Christie proffered any opinion about whether the minor had been the subject of sexual abuse; (2) neither of the witnesses testified that they were experts in the field of child sexual abuse detection; and (3) there was no testimony from either of these two witnesses that play with anatomically correct dolls by a child is a scientific method of detecting sexual abuse. HSA concludes that since no expert opinion was ever offered based on the observation of Christie's play with the dolls, the harm sought to be prevented by

the *Kelly-Frye* rule—the unquestioned reliance by the trier of fact on an expert opinion—does not attach in this case.

We reject HSA's contentions for two reasons. First, the record does not support HSA's contention that there was nothing more than mere nonexpert, nonopinion testimony about doll play. In fact, both Jill Mayer and Pat Ladousier claimed credentials qualifying them to use the dolls or to identify victims of child abuse. Moreover, the opinions of both these witnesses were implicit in their testimony. Ms. Ladousier testified that she is trained to recognize behaviors indicative of sexual abuse, that one of those behaviors is age-inappropriate knowledge of sexual activities, and that she found the acts she witnessed Christie engage in with the dolls to be inappropriate for her age. Ms. Ladousier further testified that Christie's play with the dolls at least reinforced her belief that she had to make a sex abuse report with regard to Christie. Ms. Mayer testified that she detained Christie after witnessing her play with the dolls. Thus, while these witnesses did not feel able to, or were not willing to, testify directly to an opinion on the question of sexual abuse, it is clear from the record that they suspected such abuse based on their training and experience.

Secondly, accepting HSA's initial premise as true, the cases make it clear that the presence or absence of an expert opinion is not a necessary factor in determining the applicability of the *Kelly-Frye* rule. Indeed, an identical contention was rejected by the California Supreme Court in *People* v. *Shirley, supra,* 31 Cal.3d 18.

"The Attorney General contends the *Frye* rule is inapplicable in the present context, making in essence the following argument: The rule is assertedly limited to cases in which (1) an expert witness gives his opinion (2) interpeting [*sic*] the results of a new technique for scientifically testing or analyzing physical evidence, and (3) that opinion goes directly to the existence or nonexistence of a disputed fact, which is often the ultimate issue in the litigation. By contrast, in cases such as the present it is not the expert (i.e., the hypnotist) who ordinarily testifies; the process involved (i.e., the hypnotizing of a potential witness to improve his recall) has nothing to do with testing physical evidence; if the expert does testify, he should not be asked to interpret the results of the technique (i.e., to give his opinion on whether the revived memories of the hypnotized subject are true) but simply to discuss its methodology (i.e., to explain how the hypnotic session was conducted); and the latter testimony evidently does not go to the disputed fact or ultimate issue (e.g., the identity of the culprit). Rather, in the typical case the witness is the person who actually perceived the event that is the subject of the litigation, and his testimony is the same as that of any other

lay witness, i.e., he states his present recollection of that event to the best of his ability. . . .

"The argument is unpersuasive for a number of reasons. First, it proceeds from an unduly narrow reading of the opinions invoking the *Frye* rule: as we said in *Kelly,* for example, the rule applies to evidence 'developed by' or 'based upon' new scientific techniques. (17 Cal.3d at p. 31.) Nor are those techniques necessarily limited to manipulation of physical evidence: we do not doubt that if testimony based on a new scientific process operating on purely psychological evidence were to be offered in our courts, it would likewise be subjected to the *Frye* standard of admissibility. In either case, the rule serves its salutary purpose of preventing the jury from being misled by unproven and ultimately unsound scientific methods. (*Kelly,* at pp. 31-32.)" (31 Cal.3d at pp. 52-53, fn. omitted.)

HSA also argues that *Kelly-Frye* does not apply because the doll play evidence here was offered only to show Christie's "state of mind." In other words, it was offered to show Christie's precocious knowledge of sexual matters and not to prove the fact of abuse. However, evidence of Christie's precocious knowledge could only have been relevant if offered to prove the fact alleged in the petition—sexual abuse. That this was the trial court's understanding of the relevance of the evidence is apparent from the court's statement made during the hearing of the parents' motion for reconsideration: ". . . obviously the whole import was that Christie playing with these anatomically correct dolls indicated that she had some type of knowledge that could only come from being sexually abused."

In other words, evidence of Christie's precocious sexual knowledge had no relevance to the proceedings unless it tended in some way to prove or disprove sexual abuse.

III

*Was the Error in the Admission of the Doll Play Evidence Prejudicial?*

█ HSA contends that assuming error in the admission of the doll play testimony, there was no prejudice because the trial court had an opportunity to reconsider its jurisdictional finding after being informed of the opinions in *In re Amber B., supra,* 191 Cal.App.3d 682, and *In re Christine C., supra,* 191 Cal.App.3d 676. However, when the original jurisdictional finding was made, it is clear that the trial court relied to a large extent on the evidence of Christie's play with the dolls in resolving what it considered to be an extremely close case. The court stated: "The more difficult question, of course, is whether the home is unfit because of sexual abuse. If the

burden of proof were beyond a reasonable doubt, I wouldn't have any problem with this case because there's not that type of proof on the County's part, that there has been sexual abuse to such a degree that the home is unfit. But the burden of proof is a preponderance of the evidence and, again, I'm with Mr. Haughey. I have great concerns how a child of five years of age who admittedly is even delayed in her development is so sexually precocious. Part of that great concern is her explicit sexual play with the anatomically correct dolls, especially the stroking of the male penis and oral copulation of the dolls of both sexes."

There is nothing in the record of the hearing on parents' motion for reconsideration to indicate that the trial court felt there was sufficient evidence apart from the evidence related to the dolls on which to base a jurisdictional finding.

We conclude that the error cannot be characterized as harmless. (*In re Amber B., supra,* 191 Cal.App.3d 682, 691; *In re Christine C., supra,* 191 Cal.App.3d 676, 681.)

## DISPOSITION

The dependency order is reversed.

Woolpert, Acting P. J., and Stone (W. A.), J., concurred.