Filed 4/23/14  P. v. Gutierrez et al. CA2/ 6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>   Plaintiff and Respondent,<br><br>v.<br><br>JONATHAN GUTIERREZ, DAVID CONTRERAS, ANDREW GARCIA,<br><br>   Defendants and Appellants. | 2d Crim. No. B244448<br>(Super. Ct. No. BA369668)<br>(Los Angeles County)<br>MODIFICATION OF OPINION<br>(No Change in Judgment) |

THE COURT:

On the court's own motion, the opinion filed herein on March 27, 2014, is modified as follows:

1. At lines 3-4 of the first full paragraph on page 10, delete the citation of *People v. Martin* (2013) 222 Cal.App.4th 98, 105, and footnote 5.  The deletion is necessary because on March 26, 2014, the California Supreme Court granted review in *Martin*, Supreme Court Case No. S242447.

2. Delete the entire paragraph appearing at pages 10-11 immediately before the heading, "*Disposition*."  In its place, insert the following paragraph:

Garcia and Contreras are not entitled to a new sentencing hearing during which the trial court considers "all mitigating circumstances attendant in [their] crime and life." (*People v. Caballero*, *supra*, 55 Cal.4th at pp. 268-269.)  A juvenile offender

who commits murder is entitled to no more than "a 'meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.' " (*Id*., at p. 269.) Senate Bill No. 260 provides that opportunity to Garcia and Contreras.

There is no change in judgment.

Filed 3/27/14 (unmodified version)
## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX


| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>JONATHAN GUTIERREZ, DAVID CONTRERAS, ANDREW GARCIA,,<br><br>      Defendants and Appellants. | 2d Crim. No. B244448<br>(Super. Ct. No. BA369668)<br>(Los Angeles County) |


Jonathan Gutierrez, David Contreras, and Andrew Garcia appeal from the judgments entered after their conviction by a jury of the first degree murder of Moises Castro. (Pen. Code, §§ 187, subd. (a), 189.)[1] As to each appellant, the jury found true allegations that a principal had discharged a firearm causing death (§ 12022.53, subds. (d), (e)) and that the crime had been committed for the benefit of a criminal street gang. (§ 186.22, subd. (b)(1)(C).) The court sentenced each appellant to prison for 50 years to life: 25 years to life for first degree murder plus a consecutive term of 25 years to life for the firearm-gang enhancement. (§ 12022.53, subds. (d), (e).)

Contreras and Gutierrez contend that the trial court erroneously excluded expert testimony on psychological factors affecting eyewitness identification. Contreras and Garcia argue that, because they were juvenile offenders, their 50-year-

---

[1] All statutory references are to the Penal Code.

to-life sentences constitute cruel and unusual punishment. Contreras claims that the trial court erroneously instructed the jury on the liability of principals in the commission of a crime. Each appellant joins in any contention raised by a co-appellant that may accrue to his benefit.

*Facts*

In March 2010 Gutierrez and Garcia were members of the Breed Street criminal street gang. One or two days before March 29, 2010, all three appellants were inside Maria Luna's apartment at 125 North Matthews Street in the City of Los Angeles. Gutierrrez and Garcia said that they were going to "jump" Contreras into the gang. A gang expert explained: "Gang members can join a gang by being jumped in, which means they're beaten by numerous members of the gang."

Appellants left Luna's apartment and returned about 20 minutes later. Contreras's clothes were dirty and his lip was bleeding. Gutierrez and Garcia said that they had jumped Contreras into the gang. Gutierrez also said that he was going to take Contreras on his "first mission." A gang expert testified that a "mission" is a criminal act committed by a gang member. The more violent the act, the more the reputation of the gang and gang member will be enhanced. Murder "is the ultimate crime that . . . gangs commit to instill the most fear and intimidation in the community."

The night before March 29, 2010, Amber Maples, an occupant of Luna's apartment, saw Gutierrez in possession of a handgun. At about noon on March 29, 2010, appellants left Luna's apartment. Approximately 15 to 20 minutes later, Maples heard four or five gunshots. Three minutes after the gunshots, appellants ran into the apartment. They were "out of breath, sweaty, panicky, nervous." Garcia and Gutierrez ran to the bathroom, where they washed and urinated on their hands. An expert on gunshot residue testified that suspects will sometimes urinate on their hands in an attempt to remove traces of gunshot residue.

Contreras went to the kitchen and spoke with Elisa Penalber, a friend of Maria Luna. Penalber said to Contreras: " 'It's okay. It's your first time putting in work.' " A gang expert testified that "putting in work" means "doing something, usually criminal,

2

to benefit the gang."  It can be anything "from committing petty thefts in the area claimed by the gang to murder. . . . Murder . . . gains you the most respect and authority within the gang."

Penalber saw appellants "stashing the guns."  There were three guns, and she saw Gutierrez put one inside a vacuum cleaner.  Penalber asked Gutierrez and Garcia if they had taken Contreras "on his first mission."  One of them answered, "Yes," and stated that "he emptied the clip."

Penalber told Contreras "to go pee on his hands."  She believed that "gun powder goes off . . . when you pee on your hands."  Contreras went to the bathroom and closed the door.  Maples heard water running in the sink.

Maples saw Gutierrez and Garcia "wiping down some guns with . . . T-shirts." Gutierrez told Maples not to talk to the police.  Minutes later, the police arrived at the apartment and ordered everyone "to come out one by one with [their] hands up."

At about 12:25 p.m. on March 29, 2010, Moises Castro left his apartment to go to work.  Castro lived close to the intersection of Matthews Street and Michigan Avenue in Los Angeles.  Stephanie Rios was walking nearby.  She saw Castro running toward an alley.  Four or five men were chasing him.  The men appeared to be 17 or 18 years old, and all of them were holding handguns.  They were pointing the guns at Castro.  Rios got "a good look" at the face of the pursuer who was closest to Castro. She recognized him as Contreras, who had attended the same school as Rios.  The other pursuers said "Stop" and "Get that fool."  Contreras was holding "a silver magnum" handgun with a "round cylinder" that "turns."  He shot five times at Castro. Castro died from a gunshot wound to the left upper back.  Rios identified Contreras in a photographic lineup.

After the shooting, Castro's pursuers ran away and Stephanie Rios telephoned 911.  Officer Jose Rios drove to the scene of the shooting.  There, he heard a police radio broadcast that the suspects had run into an apartment at 125 Matthews Street. This was where Maria Luna lived.  Rios and other officers went to that location, which was about 10 houses away from the shooting.

3

Appellants, Maria Luna, Amber Maples, and Elisa Penalber were inside the apartment. They complied with a police order to exit the building. The police searched the apartment and found three handguns inside a vacuum cleaner. One of the handguns was an unloaded stainless steel .357 magnum revolver with wooden grips. (Gun #1.) The other two handguns - another stainless steel .357 magnum revolver with wooden grips and a blue steel .357 magnum revolver - were fully loaded. A firearms expert opined that a bullet jacket fragment found at the scene of the shooting had been fired from gun #1.[2] But a defense expert testified that "the strongest opinion that would be allowable by [the] current state of the science" is that "it is possible that a . . . bullet or projectile was fired from a particular weapon."

Gunshot residue was found on Contreras's hands but not on the hands of Gutierrez and Garcia. There are three different ways that gunshot residue can get on a person's hands: (1) firing a gun, (2) being in the presence of a gun when it is fired, and (3) "handling an object that [was] in the presence of a gun" when it was fired.

In a hypothetical question, the prosecutor presented the facts of the shooting to a gang expert. The expert opined that the shooting was committed for the benefit of a criminal street gang. The expert explained that the shooting "enhances [the gang's] reputation as a violent criminal street gang. . . . [¶] It enhances the reputation of those members that are involved because murder is the ultimate crime to gain the most status."

*Exclusion of Expert Testimony on Eyewitness Identification*

Contreras and Gutierrez contend that the trial court erroneously excluded the testimony of Dr. Eisen, Contreras's expert witness, on psychological factors affecting eyewitness identification. The trial court excluded Dr. Eisen's testimony because Stephanie Rios's identification of Contreras was supported by "abundant corroboration." Accordingly, the court concluded that it was "an appropriate exercise

---

[2] In his opening brief, Contreras alleges: "[P]hotographs show that the [bullet jacket fragment] was about 5 feet from Castro's body."

of discretion . . . to exclude the evidence in order to avoid wasting court time and potentially confusing the jurors under the circumstances."

In support of its ruling, the trial court cited *People v. McDonald* (1984) 37 Cal.3d 351. There, our Supreme Court declared: "[T]he decision to admit or exclude expert testimony on psychological factors affecting eyewitness identification remains primarily a matter within the trial court's discretion . . . . We expect that such evidence will not often be needed, and in the usual case the appellate court will continue to defer to the trial court's discretion in this matter. Yet deference is not abdication. When an eyewitness identification of the defendant is a key element of the prosecution's case but is not substantially corroborated by evidence giving it independent reliability, and the defendant offers qualified expert testimony on specific psychological factors shown by the record that could have affected the accuracy of the identification but are not likely to be fully known to or understood by the jury, it will ordinarily be error to exclude that testimony." (*Id.*, at p. 377, fn. omitted, overruled on another ground in *People v. Mendoza* (2000) 23 Cal.4th 896, 914.) "The Supreme Court later restated the rule expressed in *McDonald* as follows: 'Exclusion of the expert testimony is justified only if there is other evidence that substantially corroborates the eyewitness identification and gives it independent reliability.' [Citations.]" (*People v. Goodwillie* (2007) 147 Cal.App.4th 695, 725, quoting from *People v. Jones* (2003) 30 Cal.4th 1084, 1112; see also *People v. Gonzales* (2011) 52 Cal.4th 254, 290-291 ["*McDonald* does not apply when an eyewitness identification is 'substantially corroborated by evidence giving it independent reliability' "]; *People v. Sanders* (1995) 11 Cal.4th 475, 509 [trial court did not err in excluding expert testimony on eyewitness identification where "the eyewitness testimony was strong and unequivocal" and "was corroborated by other independent evidence of the crime"].)

The trial court did not abuse its discretion in excluding Dr. Eisen's testimony. Other evidence substantially corroborated Rios's identification of Contreras and gave it independent reliability. Gutierrez and Garcia took Contreras on his first "mission" on

5

behalf of the gang. About 15 to 20 minutes after they left Maria Luna's apartment, Rios saw four or five men chasing Castro and pointing handguns at him. The shooting of Castro occurred only about 10 houses away from Maria Luna's apartment. Immediately after the shooting, appellants ran to the apartment. In an effort to remove traces of gunshot residue, they washed and urinated on their hands. Gunshot residue was found on Contreras's hands, but not on Gutierrez's or Garcia's hands. Appellants hid three handguns inside a vacuum cleaner. Rios said that the shooter was holding "a silver magnum" revolver, and two of the handguns were stainless steel magnum revolvers. It is common knowledge that stainless steel is silver in color. One of the stainless steel revolvers was unloaded. This was consistent with Penalber's statement that appellants said "they let off the whole round" and "he emptied the clip." A firearms expert testified that a bullet fragment from the crime scene had been fired from this revolver.

We reject the argument that the exclusion of Dr. Eisen's testimony deprived appellants of due process of law and violated their constitutional right to present a defense. Appellants have "not established that the proffered expert testimony would have had significant probative value. [Citation.]" (*People v. Goodwillie*, *supra*, 147 Cal.App.4th at p. 725.) Contreras was not a stranger to Rios. She recognized him as someone she had seen in school. In broad daylight, she got "a good look" at his face. At one point, she was only 11 feet away from Contreras. "[T]he trial court's ruling did not prevent [appellants] from presenting a defense that [Rios was] mistaken in [her] identification of [Contreras]. [Appellants were] able to cross-examine [Rios] and challenge the accuracy of [her] identification[]. Further, the court instructed the jurors as to the factors they could consider when weighing the credibility of eyewitness testimony." (***Ibid***., fn. omitted.)

Contreras argues "that a recent decision of the United States Supreme Court [*Holmes v. South Carolina* (2006) 547 U.S. 319, 126 S.Ct. 1727, 164 L.Ed.2d 503] supports his contention that the trial court's exclusion of expert testimony regarding eyewitness identification violated his constitutional right to a meaningful opportunity

6

to present a complete defense . . . ." (*People v. Goodwillie*, *supra*, 147 Cal.App.4th at p. 727.) After a lengthy analysis, the *Goodwillie* court rejected the same contention made by the defendant in that case. (*Id*., at pp. 727-730.) For the reasons set forth in *Goodwillie*, we also "do not read *Holmes* to require a result different from the result we would reach under California precedent relating to the admission or exclusion of eyewitness identification expert testimony." (*Id*., at p. 728.)

Even if the trial court had erroneously excluded Dr. Eisen's testimony, the error would have been harmless beyond a reasonable doubt. Contreras was either the shooter or an aider and abettor of the shooting. Overwhelming evidence established that Contreras and the other appellants were among the group of armed men who pursued Castro. Contreras acknowledges that he "was tried under alternative theories that he was the shooter and that he was an aider and abettor." Thus, if Dr. Eisen's testimony would have led the jury to conclude that Contreras was not the shooter, it still would have convicted him of first degree murder on an aiding and abetting theory. The jury also would have found true the allegation that a principal had discharged a firearm causing death. (§ 12022.53, subds. (d), (e).) Contreras notes: "The prosecutor could have alleged and proved a personal firearm use enhancement as to Contreras, but deliberately chose instead to allege as to all three defendants only that a principal in the commission of the offense used a firearm. By proceeding on alternative theories, the prosecutor avoided the need to prove beyond a reasonable doubt that Contreras was the shooter."

*Jury Instruction on Principals*

The trial court gave CALJIC No. 3.00 on the liability of principals in the commission of a crime. The instruction provided in part: "Persons who are involved in committing a crime are referred to as principals in that crime. Each principal, regardless of the extent or manner of participation is *equally guilty*. Principals include: [¶] 1. Those who directly and actively commit the act constituting the crime, or [¶] 2. Those who aid and abet the commission of the crime." (Italics added.) Contreras claims that the italicized "equally guilty" language is erroneous because "in the context

7

of murder, an aider and abettor must *personally act with premeditation* in order to be guilty of first-degree murder."

"[A]s a general proposition and in most cases, CALJIC No. 3.00 is a correct statement of the law.  [Citations.]  As such, [Contreras has] forfeited [his] claim of error since [he] failed to request modification or clarification in the court below.  [Citations.]"  (*People v. Mejia* (2012) 211 Cal.App.4th 586, 624.)

In any event, the trial court also gave CALJIC No. 3.01, which "advised the jury that it must base its decision of each appellant's liability not simply on the mental state of the direct perpetrator of the crime, but on that appellant's state of mind and the extent to which he knew of and intended to facilitate the purpose contemplated by the perpetrator."  (*People v. Mejia*, *supra*, 211 Cal.App.4th at p. 625.)  Moreover, the last paragraph of CALJIC No. 3.00 advised the jury that, when the crime charged is murder, the guilt of each participant depends upon his own mental state.[3]  ". . . CALJIC No. 3.01 [and the last paragraph of CALJIC No. 3.00] adequately clarified any ambiguity created by the 'equally guilty' language of CALJIC No. 3.00.  The charge as a whole, therefore, did not mislead the jury.  [Citation.]"  (*People v. Mejia*, *supra*, 211 Cal.App.4th at p. 625.)

"Even were we to find the instruction misleading under the facts of this case, which we do not, the error was harmless beyond a reasonable doubt.  Given the strength of the evidence demonstrating that appellants . . . intend[ed] to kill [Castro], we find that if the instruction was error, beyond a reasonable doubt a rational jury's verdict would not have been different had the challenged language been omitted.  [Citation.]"  (*People v. Mejia*, *supra*, 211 Cal.App.4th at p. 625.)

---

[3] The last paragraph of CALJIC No. 3.00 provided: "When the crime charged is murder, the aider and abettor's guilt is determined by the combined acts of all the participants as well as that person's own *mental state*.  If the aider and abettor's *mental state* is more culpable than that of the actual perpetrator, that person's guilt may be greater than that of the actual perpetrator.  Similarly, the aider and abettor's guilt may be less than the perpetrator's, if the aider and abettor has a less culpable *mental state*."  (Italics added.)

*Cruel and Unusual Punishment*

At the time of the shooting, Garcia was 16 years old and Contreras was 17 years old. Because they were juvenile offenders, Garcia and Contreras argue that their prison sentences of 50 years to life constitute cruel and unusual punishment under the federal and California Constitutions.

There are two key cases concerning this issue. The first is *Miller v. Alabama* (2012) 576 U.S. __ [132 S.Ct. 2455, 183 L.Ed.2d 407]. There, the United States Supreme Court held "that the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders. [Citation.]" (***Id***., 132 S.Ct. at p. 2469.) The second case is *People v. Caballero* (2012) 55 Cal.4th 262, 268. There, our Supreme Court concluded: "[S]entencing a juvenile offender for a nonhomicide offense to a term of years with a parole eligibility date that falls outside the juvenile offender's natural life expectancy constitutes cruel and unusual punishment in violation of the Eighth Amendment. Although proper authorities may later determine that youths should remain incarcerated for their natural lives, the state may not deprive them at sentencing of a meaningful opportunity to demonstrate their rehabilitation and fitness to reenter society in the future." (***Id***., at p. 268.)

The *Caballero* court "urge[d] the Legislature to enact legislation establishing a parole eligibility mechanism that provides a defendant serving a de facto life sentence without possibility of parole for nonhomicide crimes that he or she committed as a juvenile with the opportunity to obtain release on a showing of rehabilitation and maturity." (*People v. Caballero*, *supra*, 55 Cal.4th at p. 269, fn. 5.) The legislature took heed of this recommendation. On September 16, 2013, the Governor signed into law Senate Bill 260 (SB 260), which establishes a parole eligibility mechanism for juvenile offenders with life sentences in both nonhomicide and homicide cases.

Senate Bill 260 adds section 3051 to the Penal Code. (2013-2014 Reg. Sess., ch. 312, § 4.) Section 3051 provides that, after a specified number of years of incarceration, the Board of Parole Hearings (Board) shall conduct a "youth offender

9

parole hearing" to review "the parole suitability of any prisoner who was under 18 years of age at the time of his or her controlling offense." (§ 3051, subd. (a)(1).) A controlling offense "means the offense or enhancement for which any sentencing court imposed the longest term of imprisonment."[4] (*Id*., subd. (a)(2)(B).) "A person who was convicted of a controlling offense that was committed before the person had attained 18 years of age and for which the sentence is a life term of 25 years to life shall be eligible for release on parole by the [B]oard during his or her 25th year of incarceration at a youth offender parole hearing, unless previously released or entitled to an earlier parole consideration hearing pursuant to other statutory provisions." (*Id*., subd. (b)(3).) "The youth offender parole hearing to consider release shall provide for a meaningful opportunity to obtain release." (*Id*., subd. (e).)

Section 3051 moots Garcia's and Contreras's cruel and unusual punishment claim. The statute will afford them a meaningful opportunity to obtain release on parole during their 25th year of imprisonment. (See *People v. Martin* (2013) 222 Cal.App.4th 98, 105.)[5] In his reply brief, Contreras acknowledges that a meaningful opportunity to obtain release on parole after 40 years of incarceration would not violate the Eighth Amendment: "Had appellant been convicted of second degree murder, his minimum sentence would have been 40 years [15 years to life for second degree murder plus 25 years to life for the firearm-gang enhancement], and he would not have an Eighth Amendment claim because he would have a realistic opportunity to be paroled during his lifetime, at age 57."

Garcia and Contreras are "not entitled to a new sentencing hearing during which the trial court considers 'all mitigating circumstances attendant in [their] crime and life.' [Citation.] The [relevant] judicial decisions . . . 'merely hold that a juvenile defendant may not be incarcerated for life or its functional equivalent without some

---

[4] Here, the prison terms for the offense (first degree murder) and the enhancement (§ 12022.53, subds. (d),(e)) are identical: 25 years to life. Thus, both the offense and the enhancement qualify as a "controlling offense."

[5] A petition for review is pending in *Martin.*

meaningful opportunity for release on parole during his or her lifetime.' [Citation.] . . . Senate Bill No. 260 insures that [Garcia and Contreras] will be afforded a meaningful opportunity for release on parole after a set number of years based upon fixed criteria." (*People v. Martin*, *supra*, 222 Cal.App.4th at p. 105.)

*Disposition*

The judgments are affirmed.

<u>NOT TO BE PUBLISHED.</u>


YEGAN, J.


We concur:


GILBERT, P.J.


PERREN, J.

Craig E. Veals, Judge

Superior Court County of Los Angeles

_____

Janyce Keiko Imata, under appointment by the Court of Appeal, for Defendant and Appellant Gutierrez.

Ralph  H. Goldsen, under appointment by the Court of Appeal, for Defendant and Appellant Contreras.

David H. Goodwin, under appointment by the Court of Appeal, for Defendant and Appellant Garcia.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Steven D. Matthews, Shawn Webb, Supervising Deputy Attorneys General, Zee Rodriguez, Deputy Attorney General, for Plaintiff and Respondent.